NANCY J. NIBERT, Plaintiff-Appellant and Cross-Appellee, v. AL PIEMONTE FORD SALES, INC., *et al.*, Defendants (Mechanical Breakdown Protection, Inc., Defendant-Appellee and Cross-Appellant).

Second District No. 2—96—1522

Opinion filed January 22, 1998.

424

Maureen H. Flaherty, of Lehrer, Flaherty & Canavan, of Wheaton, for appellant.

Daniel A. Wolf, of Marc K. Schwartz & Associates, of Buffalo Grove, for appellee.

JUSTICE RATHJE delivered the opinion of the court:

On January 9, 1995, plaintiff, Nancy J. Nibert, filed this action against defendants, Al Piemonte Ford Sales, Inc. (Piemonte), Ford Motor Company (Ford Motor), Ford Motor Credit Company (Ford Credit), and Mechanical Breakdown Protection, Inc. (MBPI).

Counts I and II alleged that Piemonte, Ford Motor, and MBPI

were liable for breaches of express and implied warranties, respectively, under the Magnuson-Moss Warranty Act (Magnuson-Moss) (15 U.S.C.A. § 2301 *et seq.* (West 1982)). Count III sought the revocation of the contract between Piemonte and plaintiff. Count IV alleged violations of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 1994)) by Piemonte and MBPI. Count V alleged common-law fraud against Piemonte. Count VI sought the revocation of the retail installment contract plaintiff entered into with Ford Credit.

In the week before trial, which was scheduled for August 26, 1996, plaintiff settled with Piemonte, Ford Motor, and Ford Credit. MBPI had previously filed a motion for summary judgment, where it argued that it was not liable for any breaches of express or implied warranties and that it had not violated the Consumer Fraud Act. MBPI further claimed that it was entitled to an award of its attorney fees as a prevailing party under the Consumer Fraud Act. The trial court granted MBPI's motion for summary judgment as to all counts but denied its motion for attorney fees pursuant to the Consumer Fraud Act. A timely appeal and cross-appeal were filed.

On appeal, plaintiff raises three issues, namely, (1) whether the trial court erred in granting MBPI's motion for summary judgment; (2) whether the trial court erred in denying plaintiff leave to amend her complaint; and (3) whether the trial court abused its discretion in awarding MBPI's attorney fees as a sanction when MBPI failed to settle with plaintiff. On cross-appeal, MBPI argues that the trial court erred in denying it leave to file a petition for an award of attorney fees as the prevailing party in a Consumer Fraud Act cause of action.

We first address plaintiff's argument that the trial court erred in granting MBPI's motion for summary judgment on counts I, II, and IV. Regarding counts I and II, plaintiff maintains that there was a question of fact to be determined by the trier of fact as to who is the responsible party under the subject vehicle service contract (VSC) and what agreement, if any, exists as to the essential terms of that VSC or if a contract exists at all under the facts of this case. Defendant argues in response that this court's opinion in *Saladino v. Team Chevrolet, Inc.*, 242 Ill. App. 3d 735 (1993), is virtually undistinguishable from the instant appeal and should control our determination of this issue as to counts I and II.

It is beneficial at this point to briefly describe MBPI's involvement in the instant appeal. MBPI is the administrator for vehicle service contracts (VSCs) sold through dealerships, such as Piemonte, to car buyers. Here, plaintiff had applied for a VSC administered by

MBPI when she bought the 1993 Escort from Piemonte. MBPI subsequently accepted her application, and plaintiff paid $650 for the subject VSC.

Plaintiff testified via an evidence deposition taken on June 26, 1996. Plaintiff stated that in August 1993 she was working at Sky Chief Catering, a company that provided in-flight food for airlines. At that time, she owned a 1989 Ford Escort that she had purchased from Piemonte. Plaintiff testified that she went that month to Piemonte to look for a new car. She met a salesman named Jeff. According to plaintiff, she told Jeff that she did not want to buy a used car. Plaintiff came back to Piemonte two more times before she found the car she wanted. She described it as a 1993 powder blue Ford Escort (Escort). Plaintiff stated that she first saw the car in the Piemonte showroom, and Jeff told her it was a "demo," driven only by salespeople. Plaintiff testified that it was important to her that only Piemonte salespeople had driven the Escort. Further, Jeff's "boss," whose name plaintiff could not recall, talked with her on this third trip to Piemonte and emphasized that the Escort had only been driven by salespeople.

According to plaintiff, no Piemonte employees ever told her that the Escort had been owned by someone else. She testified that Jeff and his boss told her that Piemonte would take $3,000 off the price of the Escort because it was a "demo." Plaintiff testified that she believed the $3,000 would be taken from the $14,259.67 asking price. The Escort did not have a window sticker. Jeff told plaintiff that it had been lost or had fallen off and that he would send it to her. Plaintiff stated that she never received the window sticker from Piemonte. Jeff and his boss told her the Escort had a new car warranty that was bumper to bumper.

Plaintiff stated that she traded in her 1989 Escort as part of the deal. She estimated that the 1989 Escort to be worth $5,000. She stated that, after the deal was executed, Piemonte put the 1989 Escort up for sale with an asking price of $5,600.

Plaintiff stated that, after she had agreed to purchase the Escort, she was given a number of papers to sign. According to plaintiff, Jeff talked throughout the signing of the papers, and she could not recall if she had read through them. Included in the documents she signed was one wherein she acknowledged that she had been told the Escort was a demonstrator. Further, she was given a brochure entitled "Can You Afford Not To?," which discussed a VSC administered by MBPI. Plaintiff further identified an application form signed by her for a VSC administered by MBPI.

Plaintiff further stated that she discussed an "extended war-

ranty" with Jeff and his boss. She was told by them that this new car warranty "would last for 75,000 miles and that it would begin as soon as she [left] the place." They simply said the coverage was "bumper to bumper."

At a later point in her testimony, plaintiff could not recall if the salesmen used the term "warranty." Plaintiff further stated that she also had been told that the 75,000-mile "warranty" would begin at the end of the Ford bumper-to-bumper warranty.

According to plaintiff, the Escort was financed through Ford Credit. She made the first 15 payments of $270.76 per month, but stopped making payments in December 1994. During the months that she was making payments, plaintiff took the car into Piemonte for various repairs, including a faulty cassette player, exterior paint problems, and a broken fog lamp.

Plaintiff testified that in November 1994 she received a phone call from attorney Norman Lehrer, who informed her that the subject Escort had been previously owned and. had been in an accident. She acknowledged that early in December 1994 she authorized her attorneys to send a letter to Ford Motor revoking the contract. Ford Motor never responded to this letter. Late in December 1994, she received a letter from Ford Credit in which the latter informed her that it was charging her late fees. She stated that she was later sued by Ford Credit in a replevin action filed in the circuit court of Cook County.

Finally, plaintiff stated that she would not have purchased the Escort if she had known that it had been previously owned and then repossessed and that she would not have purchased the vehicle if she had known that the Ford bumper-to-bumper warranty began to run before she bought it. Plaintiff further testified that Piemonte never offered to take the Escort back and that she was still driving it.

The record on appeal includes the following relevant documents that related to the August 14, 1993, sale of the Escort to plaintiff:

1. Piemonte "Bill of Sale." This was dated August 14, 1993. This shows that the selling price was $14,259.67, the trade-in allowance was $4,000, and the unpaid balance was $11,607.12.

2. "Acknowledgement of Disclosure by Dealer of Demonstrator Motor Vehicle." This was dated August 14, 1993, and signed the same day by plaintiff. Therein plaintiff acknowledged that she had been told that the Escort was a "demonstrator" and that the vehicle had not been previously titled.

3. "Warranty Information Booklet" for 1993 Ford and Mercury cars and light trucks. It states, *inter alia*, that "Bumper to Bumper coverage begins at the warranty start date and lasts three years or 36,000 miles, whichever occurs first."

4. "Can You Afford Not To ***." This brochure explains the VSC administered by MBPI. Under a heading entitled, "Protect Your Investment," the brochure listed the various systems of the vehicle and what repairs would be covered under the VSC.

5. "Vehicle Service Contract Application." This application was signed by plaintiff on August 14, 1993. Under "Term Purchased," the application stated 72 months, 75,000 miles. Under "Current Mileage," the figure of 10,459 miles was stated. Under "Plan Selected," the application states that the "New Vehicle" plan was selected and that the "Original In-Service Date" was November 30, 1992. The application has a plan for "Pre-Owned Vehicles." The application listed MBPI as the VSC's administrator.

6. "Vehicle Service Contract." This document listed plaintiff as the "Purchaser" and Piemonte as the "Issuing Dealer." It stated that the VSC expired on November 30, 1998, or 75,000 miles, "whichever occurs first." This VSC further lists the sale mileage as 10,459.

7. "Illinois Vehicle Retail Installment Contract." Dated August 14, 1993, this contract states that the cash price of the Escort was $15,600.12 and the amount financed was $12,257.12. It further stated that the total sales price (the total price of the purchase on credit, including the trade-in of $4,000) was $16,996.48.

■ In *Graf v. St. Luke's Evangelical Lutheran Church*, 253 Ill. App. 3d 588, 591 (1993), this court set out the relevant standard of review:

"Summary judgment is a drastic means of disposing of litigation and should be allowed only when the right of the moving party to judgment is clear and free from doubt. [Citation.] The purpose of a summary judgment proceeding is to determine whether there are any genuine issues of material fact which should be tried. [Citation.] In making this determination, the evidence is to be construed strictly against the movant and liberally in favor of the opponent. [Citation.] Only if the pleadings, depositions and affidavits reveal no genuine issue of material fact is the moving party entitled to judgment as a matter of law."

■ Moreover, construing a contract is a matter of law suitable for summary judgment. *Saladino v. Team Chevrolet, Inc.*, 242 Ill. App. 3d 735, 740 (1993). There is a disputed fact precluding summary judgment when the material writing contains an ambiguity that requires the admission of extrinsic evidence. *Saladino*, 242 Ill. App. 3d at 740.

In deciding the motion for summary judgment as to the express and implied warranty counts, the trial court wrote the following:

"Plaintiff contends that *Saladino*, 242 Ill. App. 3d at 735, is distinguishable. There, the defendant rejected the application for

extended repair services because the car was too old. However, the court clearly held that the document at issue was a repair contract, not a warranty, and granted summary judgment on the warranty claims. Both here and in *Saladino*, plaintiff argued apparent agency by the dealership regarding representations made. No such allegations appear in either action. In this case, plaintiff has requested leave to file an amended complaint. That motion was denied. This court must consider the existing complaint in deciding MBPI's summary judgment motion.

Plaintiff has failed to provide this court with any evidence to support her allegation that MBPI breached an express or implied warranty. The application was prepared by the dealership and signed by only plaintiff and dealer. MBPI was not involved at the negotiation stage, and cannot be held liable for making any warranties on this vehicle. Pursuant to *Saladino*, the application was related to a service contract and not a warranty. Accordingly, MBPI's motion for summary judgment is granted on counts I and II."

We find that the trial court correctly relied on *Saladino* to grant summary judgment in MBPI's favor on counts I and II. In *Saladino*, plaintiffs alleged, *inter alia*, a breach of express and implied warranty against defendant, Ryan Warranty Services, Inc. (Ryan), under the Magnuson-Moss Warranty Act. The *Saladino* court described Ryan's involvement in plaintiff's purchase of the subject vehicle thusly:

"[Plaintiffs] returned to [salesman Ed Maniurka's] office at Team Chevrolet where Ed showed [plaintiffs] a brochure entitled, 'Extended Used Car Protection Select Car Coverage, Administered by: Ryan Warranty Services, Inc.' After reaching an agreement as to the purchase price of the vehicle, Jim Foley, another salesman, presented a form to Joe and Connie entitled, 'Used Vehicle Mechanical Repair Agreement.'

The name 'Ryan Warranty Services, Inc.,' appeared at the top of the form. Joseph Saladino was listed as the customer, Team Chevrolet was listed as the dealer, and the coverage under the agreement was to be for 12 months from the agreement date or when 12,000 additional miles were registered on the odometer, whichever occurred first. The agreement date was listed as August 28, 1989. The odometer reading was listed as 36,706 miles. The agreement provided space for the signatures of the customer and the dealer's representative. Joseph Saladino signed the agreement as customer, and J. Foley signed as dealer's representative.

The agreement states: 'This form describes the protection *you* will have under *your* Mechanical Repair Agreement. In return for payment by *you* of the Agreement Charge and subject to all the

terms of this Agreement, *we* agree with *you* as follows ***.' (Emphasis in original.) The terms 'you' and 'your' are defined as meaning the customer. The terms 'we,' 'us,' or 'our' are defined as meaning the dealer issuing the agreement. The agreement sets forth the specific parts covered. It excludes costs covered by any warranty of the manufacturer, State-required dealer warranty or repairer's guarantee." *Saladino*, 242 Ill. App. 3d at 737.

Ryan filed a motion for summary judgment in the trial court. At the hearing on this motion, plaintiffs argued, *inter alia*, that there was a factual dispute over whether the agreement was a warranty. After hearing argument, the trial court ruled that the document was a repair contract and not a warranty. It further found that any assertions that the document was a warranty were not made by Ryan's employees. The trial court granted summary judgment in Ryan's favor.

■■ Addressing the issue of the propriety of granting Ryan's motion for summary judgment as to the breaches of express and implied warranties, the *Saladino* court set out the relevant definitions, thusly:

"The Magnuson-Moss Act defines a 'written warranty' as:

'(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,

which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.' 15 U.S.C.A. § 2301(6) (West 1982).

An 'implied warranty' is defined as 'an implied warranty arising under State law *** in connection with the sale by a supplier of a consumer product.' [Citation.] The agreement at issue does not come within either definition.

In fact, the Magnuson-Moss Act defines a 'service contract' as 'a contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product.' (15 U.S.C.A. § 2301(8) (West 1982).)" *Saladino*, 242 Ill. App. 3d at 741.

Based upon these definitions, the *Saladino* court concluded that the trial court correctly found that the agreement was a service contract and not a warranty. *Saladino*, 242 Ill. App. 3d at 741.

■ In the appeal at bar, the same reasoning undercuts plaintiff's argument. Though the terms and conditions of the subject VSC are not identical to those of the VSC agreement in *Saladino*, the following portion of the subject VSC demonstrates that the two agreements are substantially similar. As stated previously, in the subject agreement plaintiff was listed as "Purchaser" and Piemonte was listed as "Issuing Dealer."

> "CONTRACT: This Vehicle Service Contract ('CONTRACT') is between the issuing Dealer ('DEALER') and the Purchaser ('PURCHASER') Of the Vehicle ('Vehicle') as designated above, The CONTRACT provides specific protection for the time or mileage as indicated above, whichever occurs first. The DEALER agrees, subject to the terms and conditions of this CONTRACT, itemized herein, to repair, replace or reimburse the PURCHASER for authorized reasonable cost for parts and labor, to repair or replace any of the component/parts (which are not excluded) protected by this CONTRACT, if required, due to a MECHANICAL BREAKDOWN. Repair or replacement of the component/parts shall be performed by the DEALER or repair facility as authorized by the ADMINISTRATOR. The decision concerning procedure to repair or replace the component/parts shall be made at the discretion of the ADMINISTRATOR. Replacement of parts may be with a like kind and quality (*i.e.*, new, remanufactured or pre-owned parts). As a condition pursuant to the OBLIGATIONS of the DEALER to repair or replace any component/part, the PURCHASER shall have complied with all terms and conditions of this CONTRACT, including specifically (but without limitation) to the requirements for maintaining the VEHICLE (see 'MAINTENANCE SCHEDULES') on the CONTRACT."

We conclude that the subject agreement is a VSC and not a warranty. Following *Saladino*, we find that the subject agreement does not come within the definitions of express and implied warranties set out in the Magnuson-Moss Warranty Act. Accordingly, we hold that the trial court properly granted summary judgment in MBPI's favor on counts I and II of the complaint.

Plaintiff next argues that the trial court erred in granting MBPI's motion for summary judgment as to the Consumer Fraud Act count. Plaintiff maintains that there are a number of factual disputes regarding this count that must be determined by the trier of fact. In response, MBPI maintains that the record does not demonstrate that it made misrepresentations to plaintiff or ratified misrepresentations made by Piemonte to plaintiff.

In granting MBPI's motion for summary judgment as to the consumer fraud count, the trial court stated:

> "In this case, Plaintiff lacks any evidence that MBPI made a false statement of any sort. The Application was filled out and priced by the dealership. Plaintiff has not been given leave to file an Amended Complaint alleging agency or apparent agency. The record contains no support for the argument that MBPI accepted the application knowing that it contained false or fraudulent statements. Accordingly, MBPI's Motion for Summary Judgment on Count IV is granted."

■ We do not agree with the trial court's assessment of the evidence in regard to the Consumer Fraud Act count. Of particular concern is plaintiff's application for the VSC. That document states that the current mileage on the Escort was 10,459. We note in passing that this appears to be a very high amount of mileage for a dealership's demonstration vehicle. In a box next to that for mileage, the application states that the "In-Service Date" is August 14, 1993. In a box right below those of "Mileage" and "In-Service Date," under the heading "TERM PURCHASED," the application states 72 month—75,000 miles.

Farther down the application there is a heading entitled "Plan Selected." Below that is a box with the heading "New Vehicle." In that box, the "Original In-Service Date" is listed as November 30, 1992. In the same box, the "Purchase Date" is stated as August 14, 1993.

There is an apparent contradiction in this application between the in-service dates, *i.e.*, November 30, 1992, and August 14, 1993. Further, it appears from this application that the term purchased by plaintiff began to run on November 30, 1992, and that, on plaintiff's purchase date of August 14, 1993, the duration of the VSC was down to less than 65,000 miles and approximately 64 months.

While we are not certain what this all means regarding the subject VSC, it raises enough questions as to MBPI's ratification of the VSC application for us to disagree with the trial court's granting of summary judgment in MBPI's favor on the Consumer Fraud Act count. It is up to the trier of fact to sift through this evidence and determine whether there is a violation under the Consumer Fraud Act.

Moreover, *Saladino* is of little relevance here. In *Saladino*, there was apparently no evidence of any possible misrepresentations in the documents related to the VSC, a clear distinction from the subject VSC.

■ Next, plaintiff argues that the trial court erred in denying her

motion to amend her complaint. After reviewing the arguments and the facts, we find that the trial court did not abuse its discretion in denying plaintiff's motion to amend the complaint. However, in regard to the Consumer Fraud Act count, we note that the time constraints that supported the denial of the motion, *e.g.*, the necessity of reopening discovery and the lateness of introducing an entirely new legal theory, will not likely be present on remand.

■ Finally, plaintiff argues that the trial court erred in ordering plaintiff's attorney to pay MBPI $500 in fees for his failure to settle the case with MBPI. Specifically, plaintiff contends, *inter alia*, that the trial court has the obligation to state the basis upon which the fees are awarded and that the trial court made no such finding. Plaintiff's attorney also argues that the $500 fee amounts to a contempt citation and yet he was given no opportunity for a hearing on the matter.

In response, MBPI admits that the sanction was for contempt of court and contends that the trial court acted properly in imposing the $500 sanction which, according to MBPI, was imposed because of plaintiff's attorney's "unjustified and indefensible waste of judicial resources and that of MBPI."

The trial in this case was scheduled for August 26, 1996. On August 21, 1996, the parties were in open court to discuss the progress of settlement negotiations. During this hearing, the following dialogue occurred between the trial court and plaintiff's attorney:

"THE COURT: In light of the fact that we have a trial date quickly approaching and certainly we have got motions for summary judgment pending and counsel have been present in the courtroom all morning prepared to argue those motions, let me ask [plaintiff's attorney] what [his] position is on that.

MR. LEHRER [Plaintiff's attorney]: If in fact the case settles, then I guess that takes care of that. If it doesn't, I believed this case was settled before I left for vacation, and as a result had not filed responses to the motions for summary judgment. If the case does not settle, I will file an emergency motion by tomorrow morning asking leave to file responses to the summary judgment and asking for a short continuance of the trial."

Subsequently, the attorney for MBPI told the court:

"MR. SCHWARTZ: Your Honor, on behalf of M.B.P.I., Mr. Lehrer and I have never had any conversations whatsoever regarding settlement between his client and Mechanical Breakdown Protection. Our motion for summary judgment was filed long ago. Mr. Lehrer was given an opportunity to reply, or to respond, and I was given an opportunity to reply. That briefing schedule was today pending the motion to amend the complaint which was then

denied. Mr. Lehrer was given an additional amount of time to respond and I was given an amount of time to reply. Any settlement discussions that have been going on have involved Mechanical Breakdown Protection in no way, shape, or form. Never been involved in any conversation, never been made any offer, never— never given an offer, no demand has ever been made."

Further, on August 21, 1996, the trial court entered an order which stated:

"Hearing on the motions for summary judgment continued until tomorrow at 9:30 a.m. ***. If the case is not settled by tomorrow, Plaintiff will be ordered to pay attorney's fees and costs incurred by [Ford Motor] and [MBPI] in attending today's scheduled hearing."

The trial court entered an order on August 22, 1996, which stated in relevant part:

"Plaintiff's counsel shall pay the sum of $500 to MBPI as an award of attorney's fees pursuant to this court's draft order of 8/21/96."

The parties agree that the punishment meted out to plaintiff's attorney was based on a finding of contempt of court. However, there was no such finding made explicitly by the trial court, and the trial court did not characterize what type of contempt was involved. Nor is there any indication that the trial court held a hearing on the matter.

We agree with the plaintiff's attorney that the manner in which this matter was handled amounted to giving MBPI an advantage in any settlement negotiations that would take place following the August 21, 1996, hearing and prior to the 9:30 a.m. hearing on August 22, 1996. Moreover, the trial court's failure to set out the exact reasons for the $500 fine and its failure to hold a hearing in a situation that, if proved, would amount to indirect civil contempt (see, *e.g., Pryweller v. Pryweller*, 218 Ill. App. 3d 619, 629-35 (1991)) lead us to the conclusion that the order for the $500 fine against plaintiff's attorneys must be reversed.

The question remains as to whether this court should remand the matter for a hearing. When determining whether a contempt hearing is necessary, the court of review should ask " 'what does the court primarily seek to accomplish' " (*People v. Doherty*, 165 Ill. App. 3d 630, 634-35 (1988), quoting *Shillitani v. United States*, 384 U.S. 364, 370, 16 L. Ed. 2d 622, 627, 86 S. Ct. 1531, 1535 (1966)). Obviously, in this matter, the trial court sought to reach a settlement between plaintiff and MBPI. That is ultimately a matter for the parties to decide and not one for the trial court to coerce by means of fines. We conclude that, under the subject circumstances, nothing would be

gained by remanding this issue for a contempt hearing. Accordingly, we reverse the imposition of the $500 fine.

Finally, because the granting of MBPI's motion for summary judgment on the Consumer Fraud Act count has been reversed and the cause has been remanded, we do not need to address the issue raised in MBPI's cross-appeal, wherein MBPI asserts that the trial court erred in denying it leave to file a petition for an award of attorney fees as prevailing party in a Consumer Fraud Act action.

For the reasons stated above, we affirm the judgment of the circuit court of Du Page County in part, reverse it in part, and reverse and remand the cause in part.

Affirmed in part; reversed in part; and reversed and remanded in part.

DOYLE and HUTCHINSON, JJ., concur.