PAUL H. SCHWENDENER, INC., Plaintiff and Counterdefendant-Appellant, v. LARRABEE COMMONS PARTNERS, as Sole Beneficiary of LaSalle National Bank Trust No. 111955, Dated March 16, 1987, *et al.*, Defendants and Counterplaintiffs-Appellees.

First District (1st Division)    No. 1—01—0618

Opinion filed March 10, 2003.

Ungaretti & Harris (J. Timothy Eaton, of counsel), Shefsky & Froelich (Brian J. Crowe, Jack Hagerty, and Patricia S. Spratt, of counsel), and Friedman & Holtz, P.C., (Gregory A. Friedman and Paula K. Maguire, of counsel), all of Chicago, for appellant.

Novoselsky Law Offices (David A. Novoselsky, of counsel) and Kevin M. Forde, Ltd. (Kevin M. Forde, of counsel), both of Chicago, and Bellas & Wachowski, P.C., of Park Ridge, for appellees.

JUSTICE McNULTY delivered the opinion of the court:

Paul H. Schwendener, Inc. (PHS), sued Larrabee Commons Partners (LCP) for breach of a construction contract. LCP countersued and demanded a jury trial. Years later, on the eve of trial, LCP withdrew its jury demand. PHS promptly filed its own demand for a jury trial on the counterclaim and on the complaint. The court denied the jury demand. After a bench trial the court entered judgment in favor of LCP. We reverse and remand because section 2—1105 of the Civil Practice Law (735 ILCS 5/2—1105 (West 1998)) protects the counterdefendant's right to demand a jury once the counterplaintiff withdraws its jury demand. We also find, in light of the right to a jury trial on the counterclaim, that the court abused its discretion by denying the late jury demand on the complaint.

## BACKGROUND

Resolution of the dispositive issue for this appeal requires no extensive discussion of the evidence in the 160-volume record filed in this court. Nonetheless we will discuss some of the proceedings and the evidence to provide guidance to the trial court for the retrial.

In March 1987, Tem Horwitz, on behalf of LCP, and Michael Schwendener, on behalf of PHS, signed a contract in which LCP agreed to pay PHS $8.8 million for the construction of 49 townhouse units in 10 buildings, to be completed by May 1988. The contract required PHS to document the progress of the work, and LCP agreed to make progress payments based on the work completed. LCP expressly stated in the contract that "the majority of the units *** ha[d] been presold."

Paragraph 21 of the contract provided:

"In the event Contractor [PHS] shall fail to perform any of its obligations hereunder, including without limitation, its refusal or neglect to supply a sufficiency of skilled laborers or materials of the proper quality and quantity [or] its failure to prosecute the Work with promptness and diligence ***, each of which shall constitute a default hereunder, Owner [LCP] shall have the right, after forty-eight (48) hours written notice to Contractor, to (i) remedy *** such default *** and recover from the Contractor the amount of any loss or damage *** suffered or incurred as a result of such default, including, without limitation, attorneys' fees, *** in which event Owner may deduct and withhold from payments otherwise due Contractor any of the foregoing amounts, which deductions shall be deemed credits or back charges against the Price, or (ii) terminate this Contract.

*** In the event of termination of this Contract, Owner may use Contractor's material and equipment to complete the Work, or may complete the Work in any other expedient manner, and the Contractor shall receive no further payments until the Work is complete. Upon completion, if the unpaid balance of the Price exceeds Owner's cost of completion ***, such excess shall be paid to the Contractor, but if such cost of completion exceeds the unpaid balance of the Price, the Contractor shall pay the difference to the Owner ***."

The contract further permitted the parties any other remedies "existing at law or in equity."

Several delays affected the project. Poor work on some buildings by the carpentry subcontractor and the masonry subcontractor impeded progress significantly. Those subcontractors put up some walls out of plumb. PHS fired both subcontractors, tore out some walls and hired new subcontractors to reconstruct the walls.

LCP held the initial open house in January 1988, showing realtors the one model townhouse PHS had completed by that date. Sales remained slow in the months following the open house. In July 1988 LCP hired an outside marketing firm to sell the townhouses. Many units sold for prices considerably lower than the prices LCP had listed.

PHS presented applications for progress payments to LCP regularly during the course of construction. Representatives of both parties reviewed the applications to determine the amount due for the work completed. LCP then sent a copy of the application to the architect so that the architect could verify that PHS had performed the work shown on the application. Once the architect approved the application, LCP forwarded it to the bank that loaned LCP funds for the development. The bank employed its own consultants to verify that PHS had completed the work shown on the application. The bank

then decided whether to loan LCP the amount requested for payment to PHS.

LCP made the first 19 progress payments promptly. In the revised twentieth pay application, PHS requested a final payment of $520,217.35, claiming that it had completed its part of the construction project. After the usual discussion between LCP and PHS, the architect certified the request for payment on February 19, 1991. Although the bank released most of the funds, LCP decided not to forward the funds to PHS.

In 1992 PHS filed this lawsuit to recover the outstanding balance. LCP countersued for breach of contract, arguing that PHS failed to complete the project within the time designated in the contract and it failed to complete work on some of the units. LCP filed a jury demand with its answer and counterclaim.

The parties engaged in years of highly contentious discovery proceedings. Each party filed multiple motions seeking sanctions for the opposing party's refusal to respond to specified discovery despite court orders. For example, LCP refused for years to specify the alleged defects in the construction.

After six years of such proceedings, LCP sought to amend its counterclaim to add claims for common law fraud and violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1987, ch. 121½, par. 261 *et seq.* (now 815 ILCS 505/1 *et seq.* (West 2000))). A few months later PHS sought to amend its complaint to add claims for fraud and conversion. The court permitted LCP to amend the counterclaim but did not permit PHS to amend the complaint.

LCP's count based on the Consumer Fraud Act states in its entirety:

"27. Larrabee realleges and incorporates by reference the allegations contained in Paragraph 1 through 6 of the Complaint.

28. By reason of the foregoing, PHS has violated Section 2 of the Illinois [Consumer] Fraud and Deceptive Business Practices Act (815 ILCS 505/2) by, among other things, the following: (a) the use of various deceptions, fraud, misrepresentations and concealment of material facts with the intent that Larrabee rely upon the concealment, suppression or omission of such material facts, and (b) falsely representing that goods and services were of a particular standard, quality or grade when they were of another."

Paragraphs 1 through 6 of the complaint name and provide brief descriptions of the parties. The sole allegation regarding PHS or any of its employees asserts only that PHS has its principal place of business in Du Page County. LCP's counterclaim does not include any

paragraphs numbered 1 through 6; LCP began the counterclaim with a paragraph numbered 11. Paragraph 15 of the counterclaim lists several alleged breaches of the contract, including the assertion that PHS failed to manage the job properly and failed to correct defective work. In the final subclause of paragraph 15, LCP alleges that "PHS submitted false Applications and Certificates For Payment." The other subclauses of lengthy paragraph 15 refer neither to falsity nor to any representations PHS made. The counterclaim nowhere specifies any misrepresentations PHS made either in its pay applications or at any other time. The counterclaim nowhere identifies any occasion on which PHS remained deceptively silent when it had a duty to speak to LCP.

PHS moved to strike the counterclaim as deficient pleading. In the alternative PHS sought a bill of particulars to specify the alleged misconduct. The trial court denied the motion in its entirety, requiring no amendment of the counterclaim.

The court also permitted LCP to withdraw its jury demand on the eve of trial. PHS demanded a jury, arguing that section 2—1105 of the Civil Practice Law (735 ILCS 5/2—1105 (West 1998)) preserved its right to demand a jury when LCP, the counterplaintiff, withdrew its jury demand. PHS argued in the alternative that the court should permit it to file a late jury demand on both the complaint and the counterclaim. The court held that PHS did not qualify as a defendant within the meaning of section 2—1105. The court exercised its discretion to deny the late jury demand.

PHS called Horwitz as its first witness, seeking to use his testimony to disprove a number of allegations in LCP's answer and counterclaim. LCP alleged that PHS breached the contract by violating certain provisions the City of Chicago required in the construction contract. LCP paid a deposit to the city to assure compliance with the requirements. PHS asked Horwitz whether the city repaid the deposit. The court disallowed the question.

LCP sought millions of dollars in damages due to construction delays. PHS sought to present evidence that LCP did not rely on the precise date for completion stated in the construction contract. PHS asked Horwitz whether LCP presented to the city a construction schedule providing for completion beyond the date set in the construction contract. The court sustained LCP's objection to the evidence.

Much of the direct examination of Horwitz followed a distinct pattern. PHS posed a question, LCP objected, the parties argued and the court sustained the objection. Then PHS posed a new question designed to elicit the same evidence in a way that avoided the original objection. LCP objected on different grounds, the court sustained the objection, and so forth, until PHS made an offer of proof. On several

occasions the court sustained objections to the offers of proof, and the court even precluded PHS from making some offers of proof. Once the court, sustaining an objection to an offer of proof, gave as a reason for the ruling: "There's no facts in evidence to support that offer of proof."

PHS sought to elicit testimony from Horwitz regarding the presales promised in the contract. LCP objected on grounds that the evidence related to the fraud count the court had not permitted PHS to add to the complaint. When the court sustained LCP's objection, the court clarified that PHS could not ask any questions regarding presales. The court barred PHS from making an offer of proof. When PHS attempted a question about presales that did not refer to fraud, the court held the attorney in contempt.

Horwitz testified that the contract presales provision referred to refundable deposits, and he had obtained such deposits from a number of persons before construction began. PHS sought to introduce a letter LCP sent to the bank that financed the construction. In that letter LCP sharply distinguished refundable deposits, or reservations, from presales. The court sustained LCP's objection to the letter.

PHS also sought to introduce LCP's business record showing that almost all of the persons who made refundable deposits asked for refunds because LCP overpriced the townhouses. The evidence supported PHS's theory that LCP's prices, rather than any delay in construction, caused the delayed sales of the units. The court disallowed the business record as irrelevant. The court also disallowed a letter, dated December 1991 and signed by Horwitz and Robert Gordon, concerning arrangements for LCP to pay PHS the outstanding balance due.

On cross-examination Horwitz asserted, without supporting checks, receipts or invoices, that LCP spent $183,000 to correct the defects in PHS's construction.

Horwitz swore that by October and November 1987 "it became more clear that there were more serious problems" with the construction. In his frequent visits to the work site, he learned "[t]he work just wasn't getting done" and the work "appeared to be very disorganized." Horwitz swore that in October and November of 1987 he called Schwendener regularly to complain about the poor progress of the work, especially the inadequate work on the model to be prepared for the open house. He also testified that the model, when presented for the open house, "was an embarrassment." He said "[i]t had waves actually in the wall itself. *** It was not plumb," and he added that "the countertops weren't in. There was tile missing."

PHS sought to introduce evidence that in January 1988, around the same time as the open house, Horwitz signed a contract hiring

PHS to act as general contractor for construction of a different development, for an agreed price of $8.22 million. The court disallowed the evidence.

Horwitz testified on cross-examination that he signed a contract modifying the original contract here because PHS threatened to leave the project without completing it. PHS asked Horwitz about his experience hiring subcontractors directly for another construction project, on which Horwitz himself did the work of a general contractor. The court disallowed the question.

After Horwitz had been on the stand for several days, the court asked the parties to present trial plans indicating the number of hours they expected to use for full presentation of the evidence. PHS listed all witnesses on the parties' witness lists and estimated times for direct and cross-examination. PHS sought about 40 hours for the remainder of its case and another 40 hours for rebuttal of LCP's case, while approximating that LCP's presentation of its defense and counterclaim would take another 40 hours. LCP guessed that PHS could complete its case with two more witnesses requiring nine hours of examination, while LCP's defense and counterclaim would require testimony from 23 witnesses. LCP allowed itself 19 hours for questioning those witnesses, while allotting PHS 7 hours for cross-examination. LCP suggested 10 hours for PHS's defense to the counterclaim, for a total of 45 hours remaining for the case.

The court decided that 16 hours would suffice for LCP's case, both in defense and for the counterclaim, and asked PHS to estimate the time needed for rebuttal. PHS requested cross-examination time equal to the time needed for direct examination. The court found PHS unhelpful. The court decided that PHS would have

> "12 more hours of examination. That includes direct, and cross of [LCP's] witnesses in his case and any other examination up to the point of rebuttal evidence."

Throughout the remainder of trial, the court periodically told the parties how much time remained from the 12 and 16 hours allotted to them.

Schwendener testified that he met with Horwitz several times in November and December 1987, and Horwitz never complained about the quality of PHS's work. At the open house Horwitz told Schwendener he was "pleased with the level of finish and the quality" of the work. The court sustained LCP's objection to the testimony. The court also excluded evidence regarding closeout discussions with Horwitz that began in 1990. According to the offer of proof, Horwitz and Schwendener agreed to certain backcharges against the final pay application, following the process provided in the contract. Horwitz assured Schwendener LCP would soon pay PHS the agreed balance due.

When LCP completed direct examination of one of its employees, the court disallowed cross-examination on grounds that PHS had used its allotted 12 hours. Two further witnesses testified without cross-examination. LCP also offered into evidence a memo from PHS to a subcontractor requesting a cosmetic cover-up of a defect in one of the 1,400 windows in the project.

At the close of LCP's case, the court informed PHS that the time for presenting a defense to the counterclaim had expired, so the court effectively rested PHS's case in defense, without permitting the presentation of any evidence in rebuttal. PHS appended many documents and affidavits to its posttrial motion as an offer of proof for its defense to the counterclaim. The court disallowed the offer of proof.

Although the court allowed LCP to amend its counterclaim to conform to the evidence, the record on appeal includes no such amended counterclaim. The trial court entered judgment in favor of LCP on both the complaint and the counterclaim. On the complaint the court held that construction delays PHS caused and the failure to complete the construction rendered the construction less than substantial performance of the contract. The court found no reasonable reliance on precontract representations, but otherwise the court found in favor of LCP on the fraud and consumer fraud counts. The court relied particularly on the memo from PHS to its subcontractor as proof of fraud. In the judgment the court awarded LCP more than $1.8 million for delays, nearly $700,000 for management fees and sales commissions LCP failed to recover when it reduced the prices for the units, $150,000 for overcharges, and $160,000 as expenses for correcting defects in the construction and completing the construction project. The court also awarded LCP prejudgment interest, raising the total award beyond $3 million. LCP also sought attorney fees, and the court reserved ruling on that issue.

LCP's attorney, Andrew Fleming, sought leave to withdraw as counsel, alleging that LCP had failed to pay any fees for more than a year. LCP hired new counsel and sued Fleming for malpractice. That case proceeded before a different judge. The trial court for the case against PHS heard testimony on LCP's petition for attorney fees. Fleming's testimony at the hearing echoed Schwendener's testimony from the trial. Fleming said:

> "I've never, throughout the course of this entire litigation, ever heard my client once, once complain about the level of my fees. All I've heard is praise for the hard work we did throughout the course of this trial ***.
>
> At the end of this case, when it came time to pay, that's when I certainly heard, well, you committed malpractice and your fees are too high."

Fleming testified that, much as Horwitz and Schwendener came to an agreement concerning past-due bills, Horwitz agreed to payment plans for the fees Fleming charged. Horwitz "was pleased with the way the case was going. He thought that [Fleming's firm was] extremely well-organized." According to Fleming, Horwitz called the legal work "fabulous." He repeatedly assured Fleming that LCP would pay the fees, if Fleming would just wait a little longer. But he would not commit to any payment date.

Before deciding the fee issue, the court entered an order expressly finding no just reason to delay enforcement of the $3 million judgment on the counterclaim issues other than attorney fees. PHS brought this timely appeal pursuant to Supreme Court Rule 304(a). 155 Ill. 2d R. 304(a).

## ANALYSIS

■ PHS argues first that the trial court erred by denying its request for a jury trial. As the court's ruling depended solely on its construction of a statute, with no pertinent facts in dispute, we review the ruling without deference to the trial court. See *Jacobson v. General Finance Corp.*, 227 Ill. App. 3d 1089, 1093 (1992); *Advincula v. United Blood Services*, 176 Ill. 2d 1, 12 (1996).

■ Section 2—1105(a) of the Civil Practice Law provides:

"If the plaintiff files a jury demand and thereafter waives a jury, any defendant *** shall be granted a jury trial upon demand therefor made promptly after being advised of the waiver ***." 735 ILCS 5/2—1105(a) (West 1998).

LCP, the counterplaintiff, filed a jury demand with its countercomplaint, and PHS, the counterdefendant, promptly demanded a jury after LCP waived its jury demand.

■ Section 2—401(d) of the Civil Practice Law clarifies that, "[u]nless a contrary meaning is indicated, wherever used in this Act *** the term 'plaintiff' includes counterclaimants ***, and the term 'defendant' includes *** parties against whom relief is sought by counterclaim." 735 ILCS 5/2—401(d) (West 1998). The appellate court has applied section 2—401(d) to the terms "plaintiff" and "defendant" as used in section 2—1105(a), because nothing in section 2—1105(a) indicates a contrary intention. *Baldassari v. Chelsa Development Group, Inc.*, 195 Ill. App. 3d 1073, 1076-77 (1990). Thus, section 2—1105(a) commanded the court to grant counterdefendant's prompt demand for a jury trial on all claims in the countercomplaint for which counterplaintiff had a right to a jury trial. The trial court erred by denying PHS's timely demand for a jury trial on the counterclaim.

■ When LCP withdrew its jury demand, PHS also sought to have a jury decide the claims in PHS's complaint. Supreme Court Rule 183

(134 Ill. 2d R. 183) gives the trial court discretion to decide whether to grant a plaintiff's late request for a jury trial. *Hernandez v. Power Construction Co.*, 73 Ill. 2d 90, 95 (1978). In *Hernandez* the plaintiff sued for personal injuries suffered in a construction accident. The defendant filed a jury demand with its answer. Four years later and on the eve of trial the defendant waived the jury demand. The plaintiff then requested a jury trial, but the trial court denied the request.

■ Our supreme court reversed and remanded for a new trial, holding that the trial court abused its discretion by denying the late jury demand. In reasoning fully applicable to the case before this court, our supreme court said:

"[G]ood cause must be established in order to obtain an extension of time in which to file a late jury demand. [Citation.] In addition to the requirement of good cause, the court will consider inconvenience to the parties and the court, and any possible prejudice to the rights of the opposing party. ***

Because the right to jury trial is of constitutional dimension, courts will liberally construe statutes which regulate exercise of the right. '[T]he inclination of the court should be to protect and enforce the right.' *Morrison Hotel & Restaurant Co. v. Kirsner* (1910), 245 Ill. 431, 433. [Citations.]

It appears from the record that no inconvenience or prejudice would have resulted if the trial court had granted plaintiff's request for a jury trial. No inconvenience would have resulted because the case was already on the jury docket ***. No evidence of prejudice is present since both parties had anticipated a jury trial. ***

*** Plaintiff points out, and we take judicial notice of the fact, that a plaintiff who desires a jury trial in the circuit court of Cook County must wait approximately two years longer than those willing to have a bench trial. A plaintiff is thus faced with two mutually exclusive alternatives. He may obtain the benefit of a more prompt adjudication through a bench trial if he is willing to waive his right to jury trial, or he may opt for a jury trial and thereby relinquish any possibility of a more prompt adjudication. Each alternative presents considerations that are attractive to the personal injury plaintiff. Through a bench trial the plaintiff may recover damages sooner than he might if he chose a jury trial, but in a jury trial the plaintiff might enlist the sympathies of the jurors and improve his chances of recovery.

The appellate court agreed with plaintiff's analysis, holding that plaintiff's demand for a jury trial should have been granted. The court pointed out that plaintiff, because of the defendant's jury demand, had already lost the benefit of an early adjudication, and

that a denial of the demand would deprive plaintiff of the advantage of a jury trial as well. [Citations.] We agree that this element of unfairness constitutes good cause for granting plaintiff's late jury demand and that, under the facts of this case, the trial judge abused his discretion in denying plaintiff's demand." *Hernandez*, 73 Ill. 2d at 95-97.

■ Here, litigation proceeded more than six years, to the eve of trial, before LCP waived the jury. Just as the plaintiff in *Hernandez* unfairly lost both the benefit of an early trial and the right to a jury trial, the trial court's ruling here forced PHS to wait six years for the jury trial and then deprived PHS of the right to a jury trial.

LCP cites *Schwartz v. Lake View Tool & Manufacturing Co.*, 4 Ill. App. 2d 565, 570 (1955), as authority holding that the delay due to the defendant's demand for a jury trial does not constitute good cause for granting a plaintiff's late jury demand. On the issue of good cause for a late jury demand, *Hernandez* implicitly overruled *Schwartz*.

The inconvenience and prejudice to LCP from the late jury demand is even less than the inconvenience and prejudice to the defendant in *Hernandez*. Here, a statute protected PHS's right to a jury trial on the counterclaim. Because the issues raised in the counterclaim for breach of contract largely repeated the issues raised in the complaint, LCP would suffer no additional inconvenience by trying all contract issues to the jury. Following *Hernandez*, we hold that the trial court abused its discretion by denying PHS a jury trial on the complaint.

■ LCP asserts that we need not reverse based on the lack of a jury trial because PHS had no right to a jury trial on the consumer fraud count of the counterclaim, and we can affirm all of the damages awarded as appropriate relief under that count. An action under the Consumer Fraud Act "must be pleaded with the same specificity that has always been a prerequisite to an action for common law fraud." *Spengler v. V&R Marathon, Inc.*, 162 Ill. App. 3d 715, 717-18 (1987). "A person has not properly pled a cause of action for fraud unless he has set forth with specificity what the representations were, when they were made, by whom they were made, and to whom they were made." *Waterford Condominium Ass'n v. Dunbar Corp.*, 104 Ill. App. 3d 371, 376 (1982). Where a plaintiff seeks to state a cause of action for fraudulent concealment, "the complaint must plead that the concealment was done *** under circumstances creating a duty to speak." *Greene v. First National Bank of Chicago*, 162 Ill. App. 3d 914, 922 (1987).

The consumer fraud count here includes no allegations of any particular misrepresentation or of any particular circumstances giving rise to a duty to speak, such that a concealment might be fraudulent.

While proof of fraud depended largely on a memo from PHS to its subcontractor, no evidence ever tied the memo to any particular implicit or explicit representation, let alone a misrepresentation, made to LCP. LCP never connected the memo to any duty to speak to LCP. Moreover, LCP presented no evidence that the subject of the memo, a particular window, had any defect when PHS tendered the unit to LCP. In the absence of evidence connecting the memo to any implicit or explicit representation to LCP, the memo is not evidence of fraud. See *Hurley v. Frontier Ford Motors, Inc.*, 12 Ill. App. 3d 905, 910 (1973). Due to the lack of pleading or proof concerning any particular misrepresentations, or any deceptive silence in particular circumstances giving rise to a duty to speak, we cannot affirm any part of the judgment on the basis of the consumer fraud count of the counterclaim.

■ LCP also argues that we should affirm the judgment against PHS on its complaint for breach of contract because the evidence met the standard for directing a verdict against PHS on that count. The trial court held that PHS did not substantially perform its obligations under the contract, so it had no right to recover payments due under the contract. The court awarded LCP $160,000 for the cost of correcting defects and completing the construction. The award is less than 2% of the cost of the construction project established in the original contract. LCP and PHS presented evidence that LCP sold most of the townhouse units, thereby enjoying the fruit of the construction PHS largely completed. This evidence is more than ample to support a jury verdict that PHS substantially performed its obligations under the contract. See *Joray Mason Contractors, Inc. v. Four J's Construction Corp.*, 61 Ill. App. 3d 410, 411 (1978). Therefore, we must reverse the decision of the trial court on the complaint and the counterclaim and remand for a new trial.

■ Before retrial the court should permit LCP to amend its pleadings to attempt to state causes of action for fraud and consumer fraud. The amended pleadings must specify the allegedly false representations made to LCP, and where LCP seeks recovery for deceptive silence, LCP must specify circumstances giving PHS a duty to disclose on a particular occasion. The trial court permitted LCP no recovery for fraud based on misrepresentations PHS made at or before the time for signing the contract. Because LCP has not challenged the ruling, the amended fraud count should not include any allegations of fraudulent misrepresentations made at or before the time of signing the contract.

Although state appellate courts have not yet addressed the issue, federal courts in Illinois have held that the Consumer Fraud Act and its amendments do not apply retroactively. *Reichelt v. Urban Investment & Development Co.*, 577 F. Supp. 971, 976 (N.D. Ill. 1984); *Sny-*

*der v. Howard Johnson's Motor Lodges, Inc.*, 412 F. Supp. 724, 731 (S.D. Ill. 1976). Unless LCP shows grounds not to follow the federal decisions, it must shape its allegations under the Consumer Fraud Act to the act as it stood at the time of the alleged misrepresentations.

LCP did not allege fraud until discovery closed—and even then LCP's counterclaim failed to specify any particular misrepresentations. The amendment of pleadings to state a new claim after the close of discovery usually requires reopening of discovery. See *Nibert v. Al Piemonte Ford Sales, Inc.*, 294 Ill. App. 3d 423, 433 (1998); *Glenn v. Carlstrom*, 556 N.W.2d 800, 804 (Iowa 1996); *Sherman v. Adoption Center of Washington, Inc.*, 741 A.2d 1031, 1039 (D.C. 1999). Thus, the parties have not had adequate discovery concerning fraud. The trial court erred by denying PHS's request for further discovery when the court allowed LCP to add the fraud counts to the counterclaim.

If LCP can state a viable claim for fraud on remand, the court should reopen discovery to allow the parties to address this issue and any other matters in need of further discovery. In light of the need to reopen discovery, the trial court apparently lacks justification for denying PHS leave to amend its complaint to add fraud and conversion claims. If PHS states such claims with sufficient specificity, the trial court may then address the application of the statute of limitations to those claims and LCP's counterclaims for fraud and consumer fraud.

Before trial, the court, with the assistance of the parties, should establish a scheduling outline for the case, adequately accommodating the need to examine and cross-examine each necessary witness. The schedule must remain somewhat flexible to allow for unexpected developments during trial. The court must exercise its power to avoid undue delay in a manner that insures a fair trial for the parties. *Hutson v. County of Cook*, 17 Ill. App. 3d 195, 205-06 (1974). In particular, the court must reserve for the parties time for adequate presentation of a defense to all claims.

The parties have litigated questions concerning the admissibility of many documents already. The court should reconsider all documents introduced regarding the fraud counts in light of the amended pleadings. If any document is not related to any particular misrepresentation properly alleged in the pleadings, the court should exclude it as irrelevant.

To determine the admissibility of some exhibits the court may need to hold pretrial evidentiary hearings. For example, the letter Horwitz and Gordon signed in 1991 may qualify as an acknowledgment of a debt, or it may be part of the usual process of negotiating backcharges before final payment of a construction contract. If it is either, it appears to be admissible. See *Metropolitan Utilities District v.*

*Pelton*, 236 Neb. 66, 68, 459 N.W.2d 193, 195 (1990). But if Horwitz agreed to the terms under threat of litigation, the agreement may be inadmissible as an offer of settlement. See *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1088 (1995); *Miller Yacht Sales, Inc. v. Lee*, 368 So. 2d 916, 918 (Fla. App. 1979). Testimony from Gordon and Horwitz should clarify the circumstances surrounding the letter. Reference to the letter as a "settlement" does not preclude admissibility, because witnesses might refer to the usual close-out process as a kind of settlement of additions to and backcharges against the original contract price. The court should allow testimony regarding other conversations in the usual course of closing out the construction contract, like those the parties initiated in 1990.

Both parties sued for breach of contract. The pleadings establish the relevance of all evidence directly pertaining to either party's fulfillment of the requirements of the contract. The trial court barred evidence PHS offered concerning presales because the court found that it related to the fraud count the court disallowed. Schwendener and experts for PHS, in testimony the court disallowed, explained how the lack of presales delayed completion of the townhouses. Thus, the evidence helped show that LCP breached the contract, and the breach caused some of the delay for which LCP sought compensation in the counterclaim. The evidence is relevant and admissible regardless of whether PHS on remand states a viable claim for fraud. The admissible evidence includes the letter LCP wrote to its bank concerning its understanding of a presales requirement, and LCP's document showing that most parties who made deposits sought refunds because LCP overpriced the units.

Evidence that Horwitz willingly signed a major construction contract with PHS in January 1988 directly impeaches his testimony describing the deplorable state of the project from October 1987 through January 1988. The other construction contract is admissible at least as impeachment. See *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 982 (1984). Schwendener's testimony about statements Horwitz made to him at the open house further admissibly impeaches Horwitz. Horwitz's experience as his own general contractor is admissible impeachment of his testimony that a threat to leave the project compelled him, against his will, to sign a separate contract with PHS for work toward completion of this contract.

The construction schedule LCP presented to the city impeaches testimony concerning LCP's reliance on an earlier date for completion. The schedule also is admissible.

If LCP in its amended complaint again accuses PHS of violating the city's requirements, the court must admit evidence that the city

repaid LCP's deposit, as that evidence shows that LCP suffered no damage due to the alleged violation.

This case illustrates the utility of arbitration clauses. Arbitrators could have resolved this dispute years ago by applying the remedies defined in paragraph 21 of the contract to the evidence. Such a resolution would have fulfilled the original expectations of the parties concerning the allocation of the benefits and risks of the construction project. Like the benefit of an unexpected increase in real estate prices, the risk of an unexpected decrease in real estate prices usually falls on the developer, not the general contractor for the construction.

Because the contract here had no arbitration clause, this case continues to absorb the efforts of the parties. The attorneys LCP discharged after trial claimed more than $800,000 in fees based solely on the hours the attorneys spent and their customary hourly rates. Both parties could have realized substantial savings in litigation expenses by agreeing to arbitration of the dispute by arbitrators with appropriate expertise in construction disputes.

The trial court's erroneous decision to deny PHS's jury demand requires reversal of the judgment and remand for retrial. On remand the parties may amend their pleadings to attempt to state viable claims for fraud, consumer fraud and conversion. If either party states such a claim, the court must reopen discovery. The court must afford both parties sufficient time to present their cases, including rebuttal evidence and reasonable cross-examination of all witnesses. By our discussion of certain evidentiary rulings we do not mean to express any opinion on the many other evidentiary rulings the trial court made.

Reversed and remanded.

GORDON, P.J., and O'MALLEY, J., concur.